# Wytheville

E. H. BURCH v. GRACE STREET BUILDING CORPORATION.

June 10, 1937.

Present, Holt, Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*Gordon B. Ambler* and *Beecher E. Stallard*, for the plaintiff in error.

*Edwards & Davenport*, for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This is an action brought by E. H. Burch against the Grace Street Building Corporation, for personal injuries resulting from a fall through an open elevator shaft, and alleged to have been caused by the negligence of the defendant.

There were two actions brought, each by notice of motion, and a trial of each action had in the same court, but presided over by different judges. Each notice of motion contained two counts, but trial was had in each instance only on the count charging ordinary negligence. On the trial of the first action, a non-suit was taken after a motion to strike was offered at the conclusion of the plaintiff's evidence. In the second action, the trial court let the case go to a jury, and a verdict was rendered for the plaintiff in the sum of three thousand, five hundred dollars. The defendant moved the court to set aside the verdict on the grounds that it was contrary to the law and without evidence to support it. This motion was sustained, and judgment was entered in behalf of the defendant, to which the plaintiff duly excepted.

Burch was an employee of the Tanner Transfer & Storage Company, which was engaged in moving the office equipment of the Veterans' Bureau from an office building owned and maintained by the defendant. There were two elevators in the building, one in the front for passengers and one in the rear for freight. It was necessary to bring the office equipment from the eighth and ninth floors of the building to the ground floor on the freight elevator.

The work started on January 28, 1935, but Burch began his employment there on the following day. It was while engaged in moving the equipment from in front of the elevator opening on the ground floor to an auto truck or van backed up against an open platform adjacent to an outside door of the building immediately opposite the elevator shaft, that Burch received the injuries complained of.

The record presents photographic pictures and measurements portraying the elevator landing on the first floor, and the vestibule or hallway that separated the shaft from the outside door and walls. The elevator is on the west side of the vestibule and the door leading outside the building is on the east side. The elevator opening is seven feet high and five feet wide, its door being of the same size. The

outside door is about the same height, but only three feet wide. Outside the latter door is the landing platform three feet wide, against which the van was backed at the time of the accident. The elevator door is a double door, so arranged that one-half can slide up against the other half. When fully open, it stands straight out towards the east in the vestibule a distance of four feet, ten and one-half inches, and will not swing further to the north than at a right angle to the opening. On the south of the vestibule, six feet distant from the elevator door, when open is a rolling iron door. The distance of the elevator shaft eastwardly to the outside door, leading to the open platform, is six feet, two and one-half inches. In the eastern wall beside the outside door, on the right as you enter, is a steel fire-proof window with frosted glass, fifty-two by forty-two inches. More than half of the outside door and the elevator door are composed of panels of frosted glass. The vestibule, therefore, between the elevator and the outside door, when the elevator doors are fully swung open, comprises a space about six feet square.

The hand-truck being used by the plaintiff at the time of the accident, measured from outside its wheels, is twenty-two and one-half inches wide. Its width at the hand grips is twenty-two inches. Its length from toe to handles is four feet, four and one-half inches, and it is eighteen and one-half inches deep.

The accident occurred at twelve-thirty o'clock on a clear, bright day. The outside door, seven feet high and about half as wide as the vestibule itself, was open, affording light therein as well as from the window. The plaintiff admits that while he sometimes used glasses, his eyesight was fairly good.

The type of filing cabinet being handled at the time of the accident was two and one-half feet long by a foot and a half wide, the size of a usual letter-size file, and estimated to weigh, with its contents, three hundred and fifty to four hundred pounds.

With this mental picture of the physical lay-out, we will take up the proceedings in the record of the second trial. On this trial, the plaintiff abandoned the count alleging wanton negligence, and relied upon the following allegations in the other count:

"I allege that at the time aforesaid, I was engaged in the moving of said office equipment from a narrow hallway in said building, and that at the time, H. S. Burnett, your agent, while acting in the scope of his employment, was operating the elevator; that unknown to me, the said H. S. Burnett, your agent, did carelessly and negligently leave the freight elevator shaft in said building open and exposed; that you did leave the doors to said freight elevator shaft open, and did not properly guard the same nor give me any notice of my danger; that you did not properly·light the hallway in which I was working, and due to the position of the office equipment which had been placed in the hallway I was unable to see said elevator shaft; and that while engaged in moving the office equipment stored in said hallway, without any negligence on my part, the same being done in a careful and prudent manner, some of the equipment became unbalanced, and in an effort to steady it I fell down the open elevator shaft."

The testimony of Burch was that when he began work, he was taken to the eighth floor by Mr. E. L. Tanner, Jr., head of the Tanner Transfer & Storage Company, and directed to work in one of the front offices on that floor, and to load hand-trucks with filing cabinets to be taken down the hall to the freight elevator; that he never went back to the freight elevator at all, nor did he know that H. S. Burnett, the building superintendent of the defendant, had been leaving the doors of the elevator open to expedite the work; that after lunch on the first day, he drove a truck to the rear of the building, and backed it up to the open platform so that it might be loaded from the vestibule on the first floor with the equipment sent down on the ele-

vator; that with E. L. Hankins, a fellow-employee, he began loading the truck by removing the furniture from the vestibule to the van; that the lower hall, or vestibule, was completely blocked with office equipment and not very well lighted; that after working in there for twenty-five or thirty minutes, and after going in and out of the vestibule several times in performing his duties, he undertook to place a hand-truck under one of the filing cabinets, which was sitting sideways directly in front of the elevator door; that there was nothing on top of that cabinet; that there was an opening from the platform door to the elevator shaft of sufficient width within which to turn the hand-truck around and roll it out; that he succeeded in getting the lower part of his hand-truck under the cabinet, and reached over the top to pull it on the hand-truck; that he then tried to turn the loaded truck around so he could push it out of the door and on the auto truck; that as he did so, stepping slightly to the left, he stepped down into the open elevator shaft and fell to the basement floor below; and that because so many things were piled up in the vestibule, he could not see the elevator hole, or elevator shaft, and did not know that it was open.

Plaintiff's witness, Hankins, testified that shortly before the accident about four cabinets were brought down on the elevator; that Burch helped him to get all four of them off the elevator by running the hand-truck under them and bringing them out, qualifying this later by saying that he wasn't so sure that Burch helped him take them off the elevator; that it was not very bright in the vestibule; that by looking over a cabinet he could see the top of the elevator door; that while he was arranging or packing in the van three cabinets he and Burch had brought out together and put thereon, Burch went back in the vestibule to get the fourth cabinet; that while he didn't notice that the elevator had gone up as soon as they got the fourth cabinet off, "most of the time it would leave just as soon as we got

them off"; that after they had taken the cabinets off the elevator, it was only two or three minutes before they began to carry them to the van; that there was plenty of room in the vestibule in which to turn the hand-truck around after the first three cabinets were taken out, although there were other boxes and cabinets in the hallway; and that the first he knew of the accident was the sound made by the fall of Burch.

There was no one present in the vestibule when the accident occurred to Burch.

H. S. Burnett, building superintendent, admitted that he had left the door open at the request of Mr. E. L. Tanner, Jr., but this Tanner denies.

In this case, Tanner testified that when he came back after lunch on that day, there were a number of filing cabinets in the vestibule, some of which were in front of the elevator shaft itself.

During the cross-examination of Burch and Tanner, they were each confronted with portions of an authenticated stenographic report of their evidence on the trial of plaintiff's first motion for judgment, showing a variance from their present testimony. Likewise plaintiff was examined as to the variance between the allegations of the pleadings in the two motions. No satisfactory explanation was given by either for such inconsistencies.

At the conclusion of the evidence, the trial judge and the jury went to the office building and viewed the scene of the accident.

We will now consider the allegations of the notice of motion and the evidence of the plaintiff on the first trial. The count upon which he then relied was as follows:

"I allege that at the time I was assisting one Edward Lee Hankins, a fellow employee of Tanner's Transfer and Storage, *move some files from the freight elevator*, which is located at the southeast side of your building; and that H. S. Burnett, your agent, was at that time operating the elevator. *I had just finished moving a number of files from*

*the elevator into a small hallway*, at which time I turned to assist my co-worker, Mr. Hankins, in removing the files from the hallway onto a Tanner Transfer and Storage van which was backed up to the platform a few feet away. *I had just heard H. S. Burnett take the elevator up* when one of the files that we had placed on a small truck that we were using *to transfer the equipment from the elevator to the van became unbalanced*, and in trying to steady it, I was compelled to take a step backward, at which time I fell down the elevator shaft." (Italics supplied.)

In that trial, Burch, in support of the above allegations, testified that he went into the vestibule to get a cabinet sitting on a hand-truck. He said, "When I did get it it got off balance some way or other, I don't know how, but I tried to keep it from falling on me and tried to catch it and when I did I fell and fell in that hole."

Under cross-examination, Burch made the following responses to questions from defendant's counsel and from the court:

"Q. If you had been thinking about the elevator and looked straight ahead with your eyes, as good as you say they are, you would have been bound to have seen the door if it were open, would you not?

"A. *Yes, sir, I could have seen it if it was open,* I reckon.

"Q. And you could have seen it if you looked?

"A. Sure."

\* \* \* \* \* \* \* \*

"Q. You tell the jury that the cabinet was in front of the elevator entrance on the tip of a truck which was turned sideways to the entrance and that you walked around to the back of the truck for the purpose of grasping the handles and turning it to your right in order to carry it out of the hallway and that as you turned you made a step to your left into an open elevator shaft that was there? Is that right, sir?

"A. Yes, sir."

\* \* \* \* \* \* \* \*

"Q. Now put that truck in that position, which is sideways to the elevator shaft—

"By the Court:

"Q. The left side of the truck was nearest to the elevator shaft?

"A. This side.

"Q. The left side?

"A. Yes, sir."

\* \* \* \* \* \* \* \* \*

"By the Court:

"Q. I understand, but when you grasped the handles of the truck on which the cabinet was sitting, was there anything between you and the elevator shaft? Was there any other furniture between you and the elevator shaft?

"A. *No, sir, not as I know of.*

\* \* \* \* \* \* \* \* \*

"By the Court:

"Q. That isn't the question I asked you. When you walked around and put your hands on the handles of the truck for the purpose of moving it, was there anything to your left between you and the open elevator shaft?

"A. *I didn't see anything.*"

\* \* \* \* \* \* \* \* \*

"By the Court:

"Q. After you got hold of the truck was there any thing between you and the elevator shaft?

"A. No, sir; couldn't have been because I fell in there." (Italics supplied.)

It was also brought out that Tanner on the first trial, had stated that there was "plenty of room" in the opening from the platform door to the elevator shaft, in which to take up the cabinet and to turn the hand-truck around and roll it out.

It is admitted that at the conclusion of the plaintiff's above evidence in the first trial, and after defendant had made a motion to strike the evidence, and called the attention of the court to the fact that no wanton negligence was

alleged, that plaintiff took a non-suit. The second action contained a count on ordinary negligence and one on wilful and wanton negligence, the latter count being abandoned before trial.

The plaintiff assigns as grounds of error, the action of the trial court, first, in setting aside the verdict of the jury on the ground of contributory negligence, and, second, in entering final judgment for the defendant.

▮ We have no difficulty in finding that the defendant was guilty of negligence. We have then to determine whether there was sufficient evidence to make it proper to leave the question of contributory negligence to the jury.

▮▮The plaintiff relies upon Virginia Code, 1936, section 6251, and numerous cases construing that section. The language of the statute and the rulings in those cases are both perfectly plain. There can be no question now in Virginia, under the statute, that the trial court is without power to set aside a verdict unless it is contrary to the evidence, or without evidence to support it. There is not a great deal of difference between a verdict which is contrary to the evidence, or without evidence to support it. In either event, the verdict lacks the necessary support for approval. Nor can a new trial be granted unless there is sufficient evidence before the court to enable it to decide the case upon its merits.

▮ We come now to the question as to whether there is sufficient evidence in this case upon which to base these principles. The evidence relied on must be admissible. It must not be incredible. It must be such as the litigant is not estopped to rely on.

▮ All of these latter questions are involved in this case by reason of the pleadings and the evidence. While, broadly speaking, credibility is a question for the jury, the rule is subject to the exception that the courts are not required to believe the incredible. In the case of *Norfolk & Western Railway Company* v. *Strickler*, 118 Va. 153, 86 S. E. 824, 825, and in a long line of cases before and subsequent

thereto, it has been said: "This court has repeatedly de-clared that courts are not required to believe that which is contrary to human experience and the laws of nature, or which they judicially know to be incredible."

In Virginia, we have also approved the general rule that a party is forbidden to assume successive positions in the course of a suit, or series of suits, in reference to the same fact or state of facts, which are inconsistent with each other, or mutually contradictory. A litigant is estopped from taking a position which is inconsistent with one previously assumed, either in the course of litigation for the same cause of action, or in dealings *in pais*. This wise and salutary policy has been repeatedly followed. *Chesapeake & Ohio Railway Company* v. *Rison*, 99 Va. 18, 37 S. E. 320; *Canada* v. *C. H. Beasley & Brothers*, 132 Va. 166, 111 S. E. 251, 252; *Arwood* v. *Hill's Adm'r*, 135 Va. 235, 117 S. E. 603; *Alexander* v. *Commonwealth*, 137 Va. 477, 120 S. E. 296; *Fitchett* v. *Parsons*, 142 Va. 163, 128 S. E. 457; *Title, etc., Bank* v. *Clifton Forge National Bank*, 149 Va. 168, 140 S. E. 272; *Nagle* v. *Syer*, 150 Va. 508, 143 S. E. 690; *Byrd* v. *Pennsylvania Railroad Company*, 151 Va. 954, 961, 145 S. E. 722.

"A party cannot either in the course of litigation or in dealings *in pais*, occupy inconsistent positions. Upon that rule election is founded; 'a man shall not be allowed' in the language of the Scotch law 'to approbate and repro-bate' and where a man has an election between several in-consistent courses of action, he will be confined to that which he first adopts; the election if made with knowledge of the facts is in itself binding. * * *

"If the parties in court were permitted to assume incon-sistent positions in the trial of their causes, the usefulness of courts of justice would in most cases be paralyzed; the coercive process of the law available only between those who consented to its exercise could be set at naught by all. But the rights of all men, honest and dishonest, are in the

keeping of the courts, and consistency of proceeding is, therefore, required of all those who come or are brought before them." Bigelow on Estoppel (6th Ed.) 732, 783.

Under this last subject, we may also consider the effect of a change of pleadings in two actions between the same parties for the same cause of action. Pleadings are the allegations made for the purpose of definitely presenting the issue or issues to be tried and determined. We no longer treat pleadings as mere fiction. They are treated as the solemn statements of fact, upon the faith of which the rights of the parties are to be adjudged. Not only is the evidence required to follow the pleadings, but if a prior inconsistent pleading sets out a different state of facts, such prior pleading may be used to discredit the present claim of the party.

Mr. Wigmore, in his excellent treatise on Evidence, Vol. II, section 1048, says: "The basis upon which may be predicated a discrediting inconsistency on his part (the litigant) includes a whole range of facts asserted in his pleadings and in the testimony relied on by him." After an exhaustive discussion of the subject, he concludes, in section 1066: "That the pleadings in prior causes, then, can be treated as the parties' admissions, usable as evidence in later causes, must be conceded."

Compare the allegations of the plaintiff in his first proceeding with those of the second. It will be observed that he first alleged "I was assisting one Edward Lee Hankins, a fellow-employee * * * *move some files from the freight elevator, * * *. I had just finished moving a number of files from the elevator into a small hallway, * * *. I had just heard H. S. Burnett take the elevator up* when one of the files that we had placed on a small truck that we were using *to transfer the equipment from the elevator to the van became unbalanced, * * *.*" (Italics supplied.) The allegations in the second notice of motion ignored and omitted these vital statements of fact.

Under these allegations, we cannot regard it as possible that Burch moved cabinets off the elevator without knowing of its presence. In the limited space in which he was working, even with a cabinet before the elevator shaft, the size and location of the open elevator door and the shaft must have been obvious to anyone who chose to look around. The plaintiff's testimony admitting that he could have seen the open elevator door, if he had looked, necessitated the taking of a non-suit.

The evidence given by the plaintiff on the second trial, is glaringly inconsistent with the former admissions made by him. It is not only inconsistent, but it is directly contradictory. He not only formerly admitted that he knew of the existence of the elevator, and could have seen the elevator door and opening, if he had looked, but that there was nothing between him and the elevator shaft to prevent him from seeing the opening.

In addition to the above inconsistencies and contradictions in the pleadings and in the evidence on the two trials, a review of the evidence in connection with the physical lay-out, makes it difficult to credit the story of the accident as related by the plaintiff on the second trial. The little vestibule was only about six feet square. Light came into the room from an open outside door, half as wide as the vestibule itself, and from the window fifty-two by forty-two inches. The size of the hand-truck and the fact that it could be turned around, indicated little possibility of any other furniture being in the hallway. If it was piled up on the sides of the passageway, it would not have diminished the light from the outside, nor obstructed a view of the elevator door, nor of the opening to the shaft. Thus, to the admissions made by the plaintiff, is super-added the incredibility of his later testimony.

There seems to be no question but that on the first trial, the trial judge would have sustained a motion to strike plaintiff's evidence. On the second trial, another trial judge

had the opportunity not only to see and hear the witness, but to consider his evidence on the first trial; and undoubtedly he was in a position to weigh the evidence even more understandingly than can this court on the printed record. *Flannagan* v. *Northwestern Mutual Life Insurance Company*, 152 Va. 38, 146 S. E. 353.

While we have always given weight to the verdict of a jury, we have not hesitated to set aside their findings when the verdict did not rest upon facts proven, or on fair inferences therefrom. *Bailey* v. *Fore*, 163 Va. 611, 177 S. E. 100; *Johnson* v. *Richmond, F. & P. R. Co.*, 160 Va. 766, 776, 779, 169 S. E. 603; *Norfolk & W. Ry. Co.* v. *Wellons' Adm'r*, 155 Va. 218, 154 S. E. 575.

We repeat again that a verdict which has been disapproved by the trial judge is not entitled to the same weight on appeal as one that has been approved by him, and it is incumbent upon the plaintiff in error to show error when the verdict has been set aside. *Braswell* v. *Virginia Electric & Power Co.*, 162 Va. 27, 39, 173 S. E. 365; *Maurer* v. *City of Norfolk*, 147 Va. 900, 910, 133 S. E. 484; *Upton & Co.* v. *Atlantic C. L. R. Co.*, 146 Va. 475, 131 S. E. 827; *Ricketts* v. *J. G. McCrory Co.*, 138 Va. 548, 121 S. E. 916.

Applying the principle of estoppel, the plaintiff is bound by his admissions made on the first trial of this action. He is required to be confined to the course he first adopted. To approve any other rule, would open wide the courts to a protracted series of suits for the same cause of action by those who might be dishonestly inclined. Both the consistency of proceeding and the consistency of testimony are highly essential to the proper administration of justice.

Accepting in this case the admissions of the plaintiff in his prior pleadings and prior evidence, the question of contributory negligence became one for the court as a matter of law. There was sufficient evidence

before the court to show that plaintiff was not entitled to recover, and, therefore, the court was enabled to decide the case upon its merits.

The final judgment is plainly right and is affirmed.

*Affirmed.*